# IN THE UNITED STATES COURT OF FEDERAL CLAIMS
### No. 11-535C
### (Classified Opinion and Order Filed: December 31, 2012)
### (Filed Under Seal: March 5, 2013)
### (Reissued: March 8, 2013)[1]
### (Bid Protest)

```
*******************************************
                                          *       Post-award Bid Protest;
NCL LOGISTICS COMPANY,                    *       Supplementation of the
                                          *       Administrative Record;
            Plaintiff,                    *       Nonresponsibility Determination;
                                          *       De Facto Debarment; Due Process;
     v.                                   *       National Security; Disparate
                                          *       Treatment.
THE UNITED STATES,                        *
                                          *
            Defendant.                    *
                                          *
*******************************************
```

Jonathan D. Shaffer, Smith Pachter McWhorter PLC, 8000 Towers Crescent Drive, Suite 900, Tysons Corner, V.A. 22182, for Plaintiff. John S. Pachter, Mary Pat Buckenmeyer, and Andrew J. Foti, Smith Pachter McWhorter PLC, and Mary Beth Bosco and Erik M. Dullea, Patton Boggs LLP, 2550 M Street, N.W., Washington, D.C. 20037, of Counsel.

Tony West, Jeanne E. Davidson, Kirk Manhardt, and William P. Rayel, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C. 20044, for Defendant. Elizabeth Witwer, Commercial Litigation Branch, Civil Division, Department of Justice, and Scott N. Flesch, United States Army Contract and Fiscal Law Division, of Counsel.

---

## OPINION AND ORDER

---

**WILLIAMS**, Judge.

In this post-award bid protest, NCL Logistics Company ("NCL") challenges its nonresponsibility determination and exclusion from the competition in the National Afghan Trucking ("NAT") multiple-award procurement for trucking services in Afghanistan. The

---

[1] This opinion was issued as a classified opinion on December 31, 2012. On February 27, 2013, the parties proposed a public version. Adopting the redactions proposed by the parties, the Court issued this opinion under seal on March 5, 2013, and invited the parties to submit any objections by March 7, 2013. No objections having been received, the Court publishes this opinion with the redactions proposed by the parties.

Department of the Army ("Army") disqualified NCL from receiving an award on the ground that NCL was nonresponsible, a determination NCL seeks to overturn.

This matter comes before the Court on the parties' cross-motions for judgment on the Administrative Record ("AR") and Plaintiff's request for declaratory and injunctive relief. Because NCL has failed to demonstrate that NCL's nonresponsibility determination was arbitrary, capricious, or illegal, the Court grants Defendant's motion for judgment on the Administrative Record.

## Findings of Fact[2]

### The Solicitation

On February 22, 2011, the Army issued solicitation number W91B4N-11-R-5000 for NAT services in Afghanistan. The purpose of the NAT contract was to provide a secure and reliable means of distributing reconstruction material, security equipment, fuel, miscellaneous dry cargo, and life support assets to operating bases and distribution sites throughout the combined joint operations area in Afghanistan. The Army anticipated the award of indefinite delivery/indefinite quantity contracts for trucking services in three suites: Suite 1 for bulk fuel, Suite 2 for dry cargo, and Suite 3 for heavy cargo. AR 388. The NAT procurement was essentially a follow-on procurement to the prior Host Nation Trucking ("HNT") contract, which had covered substantially the same mission requirements. The Army awarded NAT contracts to 20 contractors, none of whom had been HNT prime contractors.[3]

The solicitation stated the Army would make awards based on "lowest price technically acceptable" proposals in accordance with Federal Acquisition Regulation ("FAR") 15.101-2.[4] Proposals were to be evaluated using two criteria: technical capability and price. AR 391. The solicitation stated that the Government would evaluate offerors for responsibility in accordance with FAR 9.1. AR 393-94. FAR 9.104-1 provides:

To be determined responsible, a prospective contractor must—

(a) Have adequate financial resources to perform the contract, or the ability to obtain them (see 9.104-3(a));

---

[2] The findings of fact are derived from the classified and unclassified portions of the Administrative Record. Citations to "AR" are to the unclassified portions of the Administrative Record, and citations to "NCL" or "REF" are to the classified portions.

[3] One HNT prime contractor, Anham, was subsequently awarded a NAT contract on February 7, 2012, after it was evaluated for responsibility following the settlement of its bid protest.

[4] All references to the FAR are to Title 48 of the Code of Federal Regulations as codified at the time of NCL's responsibility determination on August 10, 2011.

(b) Be able to comply with the required or proposed delivery or performance schedule, taking into consideration all existing commercial and governmental business commitments;

(c) Have a satisfactory performance record (see 48 CFR 9.104-3(b) and part 42, subpart 42.15) . . . .

(d) Have a satisfactory record of integrity and business ethics (for example, see Subpart 42.15).

(e) Have the necessary organization, experience, accounting and operational controls, and technical skills, or the ability to obtain them (including, as appropriate, such elements as production control procedures, property control systems, quality assurance measures, and safety programs applicable to materials to be produced or services to be performed by the prospective contractor and subcontractors) (see 9.104-3(a));

(f) Have the necessary production, construction, and technical equipment and facilities, or the ability to obtain them (see 9.104-3(a)); and

(g) Be otherwise qualified and eligible to receive an award under applicable laws and regulations . . . .

## Submission of Proposals and NCL's Responsibility Evaluation

NCL timely submitted its proposal for all three NAT suites. AR 4617-94, 4778-4961, 5063-5149. NCL listed the HNT contract as a reference for itself and for two of its proposed subcontractors. AR 4671, 4675-77. On July 29, 2011, the Army eliminated all bidders whose proposals failed either the technical or price requirements, and forwarded the remaining proposals for responsibility determinations. AR 17768-810. By letter dated July 30, 2011, the contracting officer informed NCL that its responsibility evaluation was ongoing and listed several areas of concern relating to NCL's performance of the HNT contract. AR 16239-41. The contracting officer issued a corrected version of this letter on August 1, 2011.[5] AR 16249-51. The contracting officer requested that NCL provide responses addressing the circumstances giving rise to the areas of concern, identifying any mitigating circumstances, and outlining the corrective action taken to prevent reoccurrence. AR 16249-51. Adverse information involved NCL's noncompliance with In-Transit Visibility ("ITV") contract requirements, failure to provide deliverables, transponder stacking throughout the life of the contract, forged Transportation Movement Requests ("TMRs"), the use of an unauthorized private security company, Watan Risk Management ("Watan"), failure to meet Private Security Contractor ("PSC") Arming Requirements, withholding of contract payments for failed missions, canceled no-pay missions, pilferage/backcharges, fuel backcharges, and use of a subcontractor that

---

[5] The contracting officer changed a reference to "reoccurring instances of submission of forged Transportation Movement Requests (TMRs)" in the July 30, 2011 letter, to "reoccurring instances of Transponder Stacking" in the August 1, 2011 letter. AR 16240, 16250.

received customer complaints. Id. In describing this adverse information, the contracting officer cited letters of concern issued to NCL dated December 22, 2009, February 1, 2010, June 24, 2010, October 19, 2010, April 18, 2011, and May 23, 2011 and two cure notices dated January 1, 2010, and March 12, 2010. AR 16249-50.

On August 1, 2011, NCL responded to the contracting officer's notice of the ongoing responsibility evaluation, detailing the relevant circumstances, mitigating factors, and corrective action with respect to each area of concern. AR 16260-66. NCL also requested further information regarding allegations of withheld funds and transponder stacking. AR 16264-65.

On August 10, 2011, contracting officer Salia J. Price found that NCL was nonresponsible, relying on NCL's performance and corrective action under the HNT contract, measured against each requirement in FAR 9.104-1. NCL 1-16.[6]

### NCL's Inability to Meet the Delivery or Performance Schedule

The contracting officer first determined that NCL did not meet the requirements of FAR 9.104-1(b), which provides that the prospective contractor must "[b]e able to comply with the required or proposed delivery or performance schedule, taking into consideration all existing commercial and governmental business commitments." NCL 4. The contracting officer stated:

> There is evidence that NCL's repeated failure to comply with the terms and conditions of [the HNT contract] inhibited compliance with the required delivery and performance requirements when performing Host Nation Trucking (HNT) in Afghanistan. Specifically the Cure Notice issued regarding failure to provide deliverables (including arming requirements), dated 1 Jan 2010; the Letter of Concern . . . issued regarding the use of an unauthorized Private Security Company (PSC) – Watan, dated 23 May 2011; and the two (2) Letters of Concern issued for failure to meet Private Security Contractor Arming Requirements, dated 1 Feb 2010 and 24 Jun 2010, respectively. These events demonstrate a systemic trend in failing to comply with significant contract requirements which include critical areas of security and safety which directly impact compliance with required schedule and performance requirements. Contractors under the HNT contract cannot perform individual transportation missions unless compliance with arming and associated training requirements and utilization of authorized PSC firms are demonstrated. NCL's history of non-compliance with submission of deliverables, inability to properly manage its employees and subcontractors, including the Private Security Contractor, and its failure to implement effective corrective action which prevented reoccurrence do not support a determination that NCL will be able to comply with the required delivery and performance requirements under the NAT requirement.

---

[6] NCL's responsibility evaluation is classified. Plaintiff's request for a redacted, unclassified version of the responsibility determination was denied by the International Security Assistance Force Joint Command on January 25, 2012. Def.'s Notice Regarding Plaintiff's Counsel's Request for Declassification (Jan. 31, 2012), Attachment 1.

NCL 4.

## NCL's Lack of a Satisfactory Performance Record

The contracting officer also found that NCL did not satisfy the requirements of FAR 9.104-1(c), which requires that prospective contractors have a satisfactory performance record. The contracting officer found that several areas of concern "indicate[d] a systemic problem with NCL adhering to the material provisions of the contract, thus resulting in significant doubt that [it could] perform the services required without a high degree of risk passed to the US Government." NCL 5.

First, the contracting officer found that on several occasions NCL failed to comply with the requirements of the HNT contract's Statement of Work ("SOW"), including "the submission of vital deliverables such as Security Plan, Training Documentation, Proof of Insurance and List of Armed Personnel, that led to the issuance of a Cure Notice on 1 Jan 2010." NCL 5. The contracting officer further found that NCL's response failed to address the cause of noncompliance and instead stated that the deliverables had been submitted within the required timeframe -- even though the deliverables were submitted after the cure notice. The contracting officer concluded: "[t]his incident demonstrates NCL's lack of responsibility and willful avoidance of compliance with contract requirements." NCL 5.

Second, the contracting officer reiterated NCL's "willful avoidance of compliance with contract requirements" based on two letters of concern in February and June 2010, for failure to comply with "Arming Requirements & Procedures for Personal Security Services Contractors and for Requests for Personal Protection (i.e. submitting required documentation)." NCL 5. The contracting officer again noted that NCL did not take corrective action until after receipt of the letters of concern. Id.

Third, the contracting officer cited a letter of concern dated May 23, 2011, for failure to utilize an authorized PSC during a mission -- a direct violation of the contract requirements -- concluding that "[t]his further substantiates NCL's lack of accountability in fulfillment of the contract requirements." NCL 5.

Fourth, the contracting officer noted that "[m]ultiple failures to comply with the HNT SOW requirements led to millions of dollars being withheld for a combination of failed missions, cancelled-no pay missions, pilferage/back charges and fuel back charges in performance of the contract from 2009 to present." NCL 5. The contracting officer stated that the canceled missions due to failure to comply with the SOW requirements "exposed Afghan and American Service members to unnecessary risk due to re-missioning or safely delivering the assigned cargo." NCL 5-6.

Fifth, the contracting officer noted that NCL's use of Narwin Wardak ("NWTC") as a subcontractor resulted in "negative feedback from the customer, specifically relative to the subcontractor's ability to meet contractual requirements and timelines." NCL 6. NCL's response attributed these issues to NWTC's "lack of western project management staff,

management processes and understanding of USG contract and performance standards." AR 16265. However, the contracting officer found that NCL's response did not address the issue and that NCL as the prime contractor maintained full responsibility for all actions of its subcontractors. NCL 6.

### NCL's Lack of a Satisfactory Record of Integrity and Business Ethics

Additionally, the contracting officer found that NCL did not satisfy FAR 9.104-1(d)'s requirement for a satisfactory record of integrity and business ethics. NCL 6. The contracting officer cited several incidents, which she found showed "a systemic pattern of fraudulent behavior and activity[.]" NCL 6. First, the Army issued a letter of concern to NCL on December 22, 2009, regarding forged mission sheets, pilferage, and non-compliance with ITV contract requirements. Id. The NAT contracting officer noted that the HNT contracting officer was not satisfied with NCL's response:

> NCL's response to this letter was not accepted by the Contracting Officer, as it did not address the issues raised in the Letter of Concern, but in turn, assigned blame on the U.S. Government by claiming the Government overlooked the importance of significant issues on this program during its implementation. Specifically, NCL cited poor "efficacy and timeliness of payment by the customer," criticized the use of hardcopy mission control sheets and characterized waiting periods at loading and unloading points as "excessive." NCL's corrective plan in response to forged mission sheets included the request for expedited payment by the Government which would reduce the motivation for theft by their employees and subcontractors, to the extent that it did exist. Further, they stated they are taking specific measures "to make the best of a flawed system being used by the Army."

NCL 6-7. The contracting officer noted that because NCL's response "ignored the serious nature of the issues raised," the HNT contracting officer issued a second letter of concern, dated December 30, 2009, requesting a detailed plan of action. NCL 7; AR 21436. In response, NCL described its corrective measures, and plans for "continual improvement." AR 21480-82. In her nonresponsibility determination, the contracting officer noted that any alleged corrective actions taken by NCL did not prevent the reoccurrence of noncompliance with ITV contract requirements as another cure notice noting NCL's declining ITV use was issued on March 12, 2010. NCL 7; AR 21501.

Second, the contracting officer reiterated NCL's failure to submit required PSC arming documentation, which she had referenced in her discussion of FAR 9.104-1(e)'s requirement that contractors have a satisfactory performance record. NCL 7. The contracting officer noted that NCL took corrective action only after receiving letters of concern, demonstrating that NCL ignored contract requirements and failed to take appropriate action absent involvement from the United States Government. NCL 7.

Third, the contracting officer referred to a letter of concern dated October 19, 2010, for "Transponder Stacking . . . and forged TMRs,"[7] noting "NCL's . . . implementation of corrective actions did not prevent reoccurrence of transponder [stacking] throughout the performance of the contract," which demonstrated NCL's integrity issues and lack of business ethics.   NCL 8. Additionally, the contracting officer stated that "NCL claims in its response that the incident reference[d] in the Letter of Concern dated 19 Oct 2010 was the only incident the firm is aware of," but did not revise her determination that there was a reoccurrence of transponder stacking. NCL 8.

Fourth, the contracting officer found that "$22,286,118.28 has been withheld for a combination of failed missions, Cancelled No Pay Missions, Pilferage/Backcharges, and Fuel Backcharges under [the HNT contract], of which $5,272,125.20 is specifically attributed to NCL's performance failures."   NCL 8.

Fifth, the contracting officer noted that NCL had been referred for proposed debarment based on "numerous acts of criminal misconduct such as transponder stacking under [the HNT contract]."   NCL 8.

Sixth, the contracting officer noted that NCL lacked business ethics and integrity based on a report regarding NCL's parent company, NCL Holdings, LLC, a prime contractor on the HNT contract, prepared by a [                                                                                      ].   Citing [      ] report, the contracting officer found that [

                                                                               ]   NCL 8.   The contracting officer also stated that [

                                                                        ]   Id.   The contracting officer specified:

        [

_____

[7] As defined in NCL's responsibility determination, "[t]ransponder stacking is the activation of multiple [Global Distribution Management System ("GDMS")] transponders without having a delivery truck assigned to each."   NCL 7.   It involves placing multiple transponders in a truck to make it appear that the truck is making multiple deliveries.   Id.   "The result of activating multiple transponders is false entitlements, such as half pays, demurrage fees, or being placed higher on the HNT Order-of-Merit List (OML)."   NCL 7.

].

NCL 8-9.

### NCL's Lack of Organization, Experience, Accounting and Operational Controls, and Technical Skills, and Lack of Qualifications and Eligibility under Applicable Laws

The contracting officer also determined that NCL did not "[h]ave the necessary organization, experience, accounting and operational controls, and technical skills, or the ability to obtain them" as required by FAR 9.104-1(e), citing a cure notice dated January 1, 2010, as well as letters of concern dated February 1, 2010, June 24, 2010, and May 23, 2011, for failure to comply with the HNT contract's PSC arming requirements.  NCL 9.  Additionally, the contracting officer cited NCL's history of forging TMRs, stacking transponders, and manipulating ITV data, concluding they indicated a lack of quality assurance and operational controls.  Id.

Finally, the contracting officer found that NCL was not qualified or eligible to receive award under applicable laws and regulations as required by FAR 9.104-1(g), because NCL had been deemed "ineligible for award" based upon a vendor vetting assessment prepared by [     ] for NCL Holdings, LLC, which the contracting officer attributed to NCL.  NCL 10.  The contracting officer stated: [

        ] . . . ."  NCL 11.  The contracting officer noted [

                                                                                   ].   NCL

13.  [

                                                                                               ]

NCL 13-14.  The contracting officer concluded that NCL posed a "force protection threat" to United States and Coalition operations and was nonresponsible under FAR 9.104-1(g).  NCL 15.

### NCL's Debriefing

By letter dated August 10, 2011, the Army informed NCL that it had been eliminated from the competition because it was nonresponsible.  AR 16367-68.  Although the Army's letter was dated August 10, NCL received the letter on August 9, 2011.  AR 16370.  Subsequently, on August 10, 2011, NCL requested a debriefing via email.  AR 16369.  NCL received a written debriefing on August 10, 2011, indicating that NCL's proposals for each suite were technically acceptable, and its prices were fair, reasonable, and balanced, but that NCL was deemed nonresponsible.  AR 16371-74.

### The Vendor Vetting Program in Afghanistan

Prior to award of the NAT contract, the military implemented a [

8

] program designed to ensure the reliability of government contractors in Afghanistan. As a result of this process, NCL was determined to be [              ] and ineligible for award, but due to the [          ] nature of the report, NCL was not advised either of the [     ] report or of its [              ] rating and ineligibility. NCL 10.

On November 5, 2010, CENTCOM Contracting Command[8] issued an "Acquisition Instruction" governing acquisitions supporting operations in Afghanistan. REF 11. The Acquisition Instruction requires contracting officers to vet all non-U.S. vendors operating in Afghanistan as directed by Fragmented Order ("FRAGO") 10-330. REF 74. FRAGO 10-330 mandated the creation of a program to "vet prospective non-US vendors to prevent insurgents, terrorists, criminals, and militias from using contract proceeds to fund their operations" and to [

] REF 218. FRAGO 606-2010, issued by the International Security Assistance Force Joint Command ("IJC"), also details procedures for the vendor vetting process. REF 236-39.

The vetting process is outlined both in the Acquisition Instruction and, primarily, in FRAGO 10-330. The process has several steps. First, a non-U.S. vendor registers with the Joint Contingency Contracting System ("JCCS") by submitting data regarding the vendor's location and identification. REF 74, 230. Second, the contracting officer submits all non-U.S. vendors for vetting by JCCS, a process which takes approximately 14 days. REF 75, 231.

A [                    ] assesses vendors by "risk to mission," and classifies that risk as either "'MODERATE,' 'SIGNIFICANT,' 'HIGH,' or 'EXTREMELY HIGH.'" REF 231. A rating of "MODERATE" means that [

]

REF 224. A rating of "SIGNIFICANT" means that [

] Id. A rating of "HIGH" means that [

] Id. A rating of "EXTREMELY HIGH" [

] The classification of a vendor as "HIGH" or "EXTREMELY HIGH" risk requires a "Validation Panel" to determine whether the vendor should be "approved" or "rejected" within three days "by considering the [          ] assessment and other relevant information." REF 231. A "rejected" vendor is ineligible to receive contract awards in Afghanistan. REF 231-33.

The FRAGO delineating the vendor vetting process contains the following sections:

---

[8] CENTCOM is a "Unified Combatant Command, directly under the Secretary of Defense, that assists nations, primarily in the Middle East, to combat terrorism, establish secure environments, and foster regional stability." Def.'s Cross-Mot. for J. on the Admin. Record 1 n.1.

> **Vetting and Contractor Assessment**: . . . If the vendor is deemed "rejected" then the ISAF [   ] will provide the [       ] assessment to the requiring activity and inform them of the decision and procedures to request an Exception to Policy (ETP), also referred to as waiver).
>
> …
>
> **Exception to Policy** (ETP) Waivers:  If after reading the [        ] assessment report and consulting with their local contracting officer, the [Battle Space Owner] or requesting activity determines that an ETP is required, they must complete a "Rejected Contractor Waiver."

REF 231-32.  As this passage indicates, a [   ] report concluding that a bidder is "rejected" does not necessarily mean that a contractor is ineligible for award at the time of rejection.  Even if the "rejected" status is confirmed by the Validation Panel, the requiring unit may seek an exception. The waiver must explain the urgent nature of the contract, the market research performed by the contracting agency, the risk to the mission if the waiver is not approved, and a proposal to mitigate risks to U.S. Forces should the waiver be granted.  REF 76, 232.  The waiver process must be completed within 30 days unless an extension is granted.  REF 233.  If a waiver is not approved by the appropriate Deputy Commander for United States Forces in Afghanistan ("USFOR-A"), a contracting officer may not award contracts to the rejected vendor.  REF 76, 233.

Under both the FRAGO and the Acquisition Instruction, notification of rejection is required only if the vendor would otherwise be the "apparent successful offeror," and the vendor requests a debriefing.  REF 75-76.  Even if an apparent successful offeror requests and receives a debriefing, the contracting officer may only inform it of the following, in writing:

> You were determined to be ineligible for award of subject contract by United States Forces – Afghanistan/Iraq.  You may submit a written request for reconsideration of this determination to USFOR-A/USF-I, through the Contracting Officer, within 60 calendar days of this notification.

REF 76.  The FRAGO mandates that rejected vendors "shall only be notified of their rejected status if there is a legal necessity to do so."  REF 233.  The Acquisition Instruction states that "[i]f an offeror is not the apparent successful offeror, follow normal procedures. **DO NOT MENTION THEIR INELIGIBILITY**."  REF 76.  Once vetted, contractors will be re-vetted every 180 days "if possible."  REF 235.  If [   ] does not re-vet a contractor, the original vetting is effective for one year.  Id.

## NCL Holdings, LLC's Vendor Vetting[9]

---

[9] In NCL's nonresponsibility determination, the contracting officer relied upon [       ] vendor vetting assessment for NCL Holdings, LLC, NCL's parent company, which was an HNT contractor.  NCL has not challenged the contracting officer's attribution of [       ] vendor vetting for NCL Holdings, LLC, to NCL.

On June 29, 2011, [    ] determined that NCL Holdings, LLC was a [

                                                              ] Specifically, [

                         ]

[

                                        ]

NCL 166.

        [    ] assessment cited [

                              ] . . . Additional reporting indicates [
                 ] . . . ." NCL 165.  NCL does not contest that [

        ]

        [    ] further noted that [

                                 ] . . . ." NCL 165.  Additional [              ] also
indicated that [

        ] . . . ." NCL 165.

        On June 29, 2011, [    ] issued [
                 ].  In accordance with the vendor vetting process, the NAT contracting officer
requested confirmation from the requiring activity as to whether it would seek a waiver.  On
August 3, 2011, the requiring activity declined to pursue a waiver.  NCL 14.  Because [    ]
assessed NCL Holdings as a [                    ] and the requiring activity did not seek a waiver,
NCL was determined to be a "rejected" contractor for United States procurements in
Afghanistan.  NCL 10.  NCL's nonresponsibility determination states: "A review of NCL's
status in the [Joint Contingency Contracting System] identifies NCL as '[    ] rejected' as of 12
July 2011 (as retrieved from the [Joint Contingency Contracting System] on 29 July 2011) and
therefore ineligible for award."  NCL 10.  The contracting officer listed NCL's "'[    ]
Rejected'" status and concomitant ineligibility as a basis for her nonresponsibility determination
issued on August 10, 2011.  NCL 15.

**Anham's Vendor Vetting Assessment and Responsibility Determination**

        Anham was initially vetted [

[                                    ] that rendered Anham eligible for contract award. On June 29, 2011, [   ] determined that Anham was a [                                    ] Between late December, 2011, and January 6, 2012,[10] Anham was re-vetted, and its [

]   The [   ] report states:

[



]

Id.

In his assessment of Anham's "record of integrity and business ethics" pursuant to FAR 9.104-1(d), a different NAT contracting officer[11] detailed findings in the supporting [      ] reports attached to Anham's vendor vetting assessment:

A review of the supporting [                              ] for Anham indicates the company [



]

NCL 180.

---

[10] The [   ] report does not include a date of issue, but supporting reports indicate the approximate time frame for Anham's vetting process.

[11] Salia Price performed NCL's responsibility determination, NCL 1-16, and Dale Van Dyke performed Anham's.  NCL 175-84.

Anham's responsibility determination also stated that "Anham's status in the JCCS system identified Anham as '[    ] Approved' as of 6 Jan 2012." NCL 181. In the final determination, the contracting officer concluded: "Anham's demonstrated trend of overcoming problematic performance on the HNT contract, and the information supporting Anham's 'ACCEPTED' status in JCCS, substantiate that Anham meets the criteria of FAR 9.104-1 for purposes of being determined a responsible contractor." NCL 184.

On February 7, 2012, the Army awarded a NAT contract to Anham.[12]

## Discussion

### Jurisdiction and Standard of Review

The Court has jurisdiction over this bid protest pursuant to the Tucker Act, 28 U.S.C. § 1491(b)(1) (2006). In a bid protest, the Court reviews an agency's procurement decision under the standards enunciated in the Administrative Procedure Act ("APA"), 5 U.S.C. § 706 (2006). 28 U.S.C. § 1491(b)(4) (2006); see Ala. Aircraft Indus., Inc.—Birmingham v. United States, 586 F.3d 1372, 1373 (Fed. Cir. 2009). Pursuant to the APA, this Court may set aside an agency action that was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706 (2)(A); Ala. Aircraft Indus., 586 F.3d at 1373.

An agency action is arbitrary and capricious when the agency "'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" Ceres Envtl. Servs., Inc. v. United States, 97 Fed. Cl. 277, 302 (2011) (quoting Ala. Aircraft Indus., 586 F.3d at 1375)). An "agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choices made.'" In re Sang-Su Lee, 277 F.3d 1338, 1344 (Fed. Cir. 2002) (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)).

"Contracting officers are afforded considerable discretion in negotiated procurements, such as this one, where award is premised on a 'best value' determination." Ceres Envtl. Servs., Inc., 97 Fed. Cl. at 302 (citing Banknote Corp. of Am., Inc. v. United States, 365 F.3d 1345, 1355 (Fed. Cir. 2004)). Importantly, "[c]ontracting officers are 'generally given wide discretion' in making responsibility determinations and in determining the amount of information that is required to make a responsibility determination." Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1334-35 (Fed. Cir. 2001) (quoting John C. Grimberg Co. v. United States, 185 F.3d 1297, 1303 (Fed. Cir. 1999)); see also News Printing Co. v. United States, 46 Fed. Cl. 740, 746 (2000) ("'A contracting agency has broad discretion in making

---

[12] Anham had previously filed suit in this Court challenging its exclusion from the competitive range. On September 30, 2011, Anham and the Government stipulated to the dismissal of Anham's lawsuit based upon a settlement agreement in which the Government agreed to resume the evaluation of Anham's proposal.

responsibility determinations since it must bear the brunt of difficulties experienced in obtaining the required performance.'") (quoting House of Commc'ns & Graphics, B-245920, 1992 WL 55054, at *2 (Comp. Gen. Mar. 4, 1992). "When such decisions have a rational basis and are supported by the record, they will be upheld." Bender Shipbuilding & Repair Co. v. United States, 297 F.3d 1358, 1362 (Fed. Cir. 2002). Plaintiff has the burden of establishing that the responsibility determination was arbitrary and capricious. Impresa, 238 F.3d at 1337.

In resolving bid protests, the trial court is to make findings of fact weighing the evidence in the administrative record. See Bannum, Inc. v. United States, 404 F.3d 1346, 1355 (Fed. Cir. 2005). If the protestor succeeds in demonstrating an error in the procurement process, the Court then proceeds to determine, as a factual matter, whether the protestor was prejudiced by that error.

## Supplementation of the AR

NCL seeks leave to supplement the AR with the following categories of documents: (1) communications between the HNT contracting officer and NCL relating to NCL's HNT performance and corrective action, (2) materials from an appeal pending before the Armed Services Board of Contract Appeals ("ASBCA") concerning a dispute between the Army and NCL under the HNT contract, including a revised final decision, an expert report, and deposition testimony, and (3) documents addressing NCL's relationship with Watan, including materials relating to Congressional investigations and declarations from NCL employees. NCL also seeks to supplement the Court's record with a decision of the Army's Suspension and Debarment Official ("SDO") terminating the referral for proposed debarment of another HNT contractor, Guzar Mirbachakot Transportation ("GMT").

The Court grants the requested supplementation in part, adding correspondence between the Army and NCL describing NCL's performance problems and corrective action under the HNT contract, a revised final decision of the HNT contracting officer reducing NCL's liability for failed fuel missions, and some documents relating to Plaintiff's relationship with Watan which were close at hand and relevant to the nonresponsibility determination. Tabs 133-37, 139-42, 144-48, 150-54, 158, 171.[13] The Court denies supplementation with other ASBCA discovery materials and documents concerning Plaintiff's relationship with Watan. The Court denies Plaintiff's motion to supplement the Court record with the SDO's decision terminating GMT's proposed debarment.

## I.   Communications Between NCL and the Army under the HNT Contract (Tabs 137, 139, 142, 145-48, 150, 158)

NCL seeks to supplement the AR with communications between NCL and the contracting officer addressing performance concerns cited in NCL's nonresponsibility

---

[13] The Army does not object to supplementing the AR with specified documents that NCL requested, Tabs 133-136, 140-41, and 151, and parts of Tabs 139, 145, and 150 (AR 21486, 21512, 21530). Def.'s Resp. to Pl.'s Mot. to Supplement the Admin. R. 1-2. As such, these documents are added to the record.

determination and NCL's corrective actions. See Tabs 137, 139, 142, 145-48, 150, 158. As the United States Court of Appeals for the Federal Circuit recognized in Axiom Resource Management, Inc. v. United States, supplementation of the record in a bid protest should be limited to cases in which "'the omission of extra-record evidence precludes effective judicial review.'" 564 F.3d 1374, 1380 (Fed. Cir. 2009) (quoting Murakami v. United States, 46 Fed. Cl. 731, 735 (2000), aff'd 398 F.3d 1342 (Fed. Cir. 2005)). Further, the determination of whether to supplement the AR must be made in the context of the solicitation requirements. Ne. Military Sales, Inc. v. United States, 100 Fed. Cl. 96, 97 (2011) ("Where . . . the Solicitation indicates that the agency will consider all materials of a particular type in its evaluation of offers, the Administrative Record is not complete if it omitted any such materials."). Here, the solicitation expressly provided that corrective action to remedy past performance problems would be considered in the responsibility assessment. AR 394. NCL listed the HNT contract as a reference in its proposal and cited its corrective action under the HNT contract in connection with the NAT contracting officer's responsibility evaluation. See AR 4671, 16260-66. In Northeast Military Sales, the Court permitted supplementation of the AR with pricing surveys, an internal agency quality control checklist, and an internal Inspector General's report, all of which contained relevant past performance information about the awardee. Ne. Military Sales, Inc., 100 Fed. Cl. at 98-100. Similarly, in the instant case, communications with the Army that reflect NCL's performance and corrective action on the HNT contract are properly added to the AR.

## II. Documents from the Ongoing ASBCA Proceeding (Tabs 154, 155, and 172)

NCL seeks to include three documents produced during an appeal it is currently litigating before the ASBCA, challenging the HNT contracting officer's determination that NCL is liable for $1,320,822.12 for 100 failed fuel missions. These documents are a revised contracting officer's final decision, an alleged expert handwriting report, and a deposition.

### A. The HNT Contracting Officer's Revised Final Decision (Tab 154)

In NCL's nonresponsibility determination, the NAT contracting officer cited NCL's withholding of $5,272,125.20 under the HNT contract, which included $1,320,822.12 for missing fuel, based on a March 17, 2010 final decision of the HNT contracting officer. See NCL 8, Tab 154 at 21558-59. However, on August 10, 2011, an HNT contracting officer, Maj. Edward Gosline, issued a revised final decision under the HNT contract reducing NCL's liability for this missing fuel, by more than half, to $609,519.14. Tab 154 at 21557.[14] Plaintiff seeks to include this revised decision absolving NCL from liability for 61 of these 100 failed fuel missions as a supplement to the AR.

---

[14] The original March 17, 2010 decision finding NCL liable for missing fuel determined that NCL did not successfully complete 61 of the 100 fuel missions because it failed to deliver the fuel within 21 days as required by a March 2010 revision to the HNT contract's Statement of Work ("SOW"). Tab 154 at 21558-59. Because 61 of NCL's allegedly failed missions occurred prior to the March 2010 revision of the SOW -- when the 21-day deadline was not in effect -- Maj. Gosline issued a revised final decision validating these 61 missions. Tab 154 at 21557.

In finding NCL nonresponsible, Contracting Officer Price did not consider the Government's substantial reduction of NCL's withholding liability in the revised final decision. See NCL 8. Because the original determination of withholding liability was a basis for NCL's nonresponsibility determination and the revised final decision is the Government's own determination that this original decision was incorrect, the revised decision ought to be part of the AR. See Am. Petroleum Inst. v. EPA, 540 F.2d 1023, 1034 (10th Cir. 1976) ("[E]vents indicating the truth or falsity of agency predictions should not be ignored."); Amoco Oil Co. v. EPA, 501 F.2d 722, 729 n.10 (D.C. Cir. 1974) (stating that "by the time judicial review is secured events may have progressed sufficiently to indicate the truth or falsity of agency predictions."); Afghan Am. Army Servs. Corp. v. United Sates, 106 Fed. Cl. 717, 724-26 (2012).

As courts have recognized, post-decisional information correcting erroneous assumptions, predictions, or facts forming the predicate for agency decision-making must be added to the administrative record to permit effective judicial review. In the context of agency rulemaking, the D.C. Circuit ruled that while "[a] reviewing court must tread cautiously in considering events occurring subsequent to promulgation of a rule . . . testimony [that] bears directly upon the plausibility of certain predictions made by the Administrator in promulgating the Regulations . . . shall [be] accept[ed] . . . into the record." Amoco Oil Co., 501 F.2d at 729 n.10. Indeed, "[a]llowing a protest to be decided upon an AR which does not reflect what actually transpired would perpetuate error and impede and frustrate effective judicial review." Ashbritt, Inc. v. United States, 87 Fed. Cl. 344, 366 (2009) (citing Axiom, 564 F.3d at 1381); see also Afghan Am. Army Servs. Corp., 106 Fed. Cl. at 724-26. Accordingly, the revised final decision issued by Maj. Gosline is properly part of the AR.

## B. The Alleged Handwriting Expert's Report (Tab 155)

NCL proposes to supplement the AR with the report of a purported handwriting expert, which NCL claims refutes the Government's allegation that NCL forged signatures on mission sheets for the remaining 39 failed fuel missions. Tab 155 at 21589-607. NCL's proffered expert in the ASBCA proceeding, Mr. Gideon Epstein, compared the signatures on the mission sheets to the "verbatim known handwriting" of Army personnel who allegedly signed the mission sheets, and concluded that the signatures on 33 of the 39 mission sheets were genuine. Tab 155 at 21596-97.[15] Although Plaintiff claims that Mr. Epstein's report confirms that NCL never forged mission sheets, Plaintiff has not suggested that the ASBCA made such a finding. Nor does the record reflect that the ASBCA determined Mr. Epstein to be an expert based upon his knowledge, skill, experience, training, or education. Moreover, the record does not indicate

---

[15] Mr. Epstein found that one mission sheet could not be examined due to the quality of the document and that another mission sheet was not signed by the same person who had given the handwriting sample. Tab 155 at 21597. Mr. Epstein could not conduct an analysis of the four remaining mission sheets because one mission sheet did not include a signature, and the other three did not have a verified signature from the individual whose signature was on the disputed mission sheet. Id.

whether Mr. Epstein was subject to cross examination or whether the government proffered a rebuttal expert.[16]

This Court recognizes that it is appropriate to supplement the record with expert testimony when necessary to assist the Court in understanding technical or complex information involved in a challenged procurement. See Guzar Mirbachakot Transp. v. United States, 104 Fed. Cl. 53, 63 (2012); East West, Inc. v. United States, 100 Fed. Cl. 53, 57 (2011); Hunt Bldg. Co., Ltd. v. United States, 61 Fed. Cl. 243, 272 (2004) (allowing supplementation of the record with expert testimony to "assist the court in understanding the financing [of] the [p]roject"); Mike Hooks, Inc. v. United States, 39 Fed. Cl. 147, 158 (1997) (noting that supplementation was appropriate in order for the Court to understand technical solicitation language regarding "minimum production rates" for shoal dredging). Rather than offering expert testimony to assist the Court in understanding complex or technical information, NCL is asking this Court to adopt wholesale an untested expert report and, from that, make a factual finding that NCL never forged certain mission sheets. Because the report is hearsay, has not been subject to cross-examination or rebuttal, and this Court has not accepted Mr. Epstein as an expert, observed his demeanor, or evaluated his credibility, this untested report lacks probative value. Cf. L-3 Commc'ns Integrated Sys., L.P. v. United States, 91 Fed. Cl. 347, 358 (2010) (finding that the Federal Rules of Evidence should be applied to materials that are extra-record supplementation of the AR to ensure their reliability). As such, the report is not necessary for effective judicial review.

## C. Deposition Testimony of an HNT Contracting Officer (Tab 172)

NCL also seeks to supplement the AR with the deposition of Lt. Col. MacIntyre, an HNT contracting officer, to support NCL's claim that "it had a satisfactory performance record" at the time of NCL's responsibility determination. Pl.'s Second Mot. to Supplement the AR 3; Tab 172 at 22515-70.[17]   In his deposition Lt. Col. MacIntyre discussed methods for calculating withholding for fuel charges and analysis of fuel mission sheets as well as some of NCL's performance and corrective actions under the HNT contract. Tab 172 at 22534-39. The cure notices and letters of concern issued by Lt. Col. MacIntyre to NCL and NCL's responses are in the AR.[18] Because Lt. Col. MacIntyre's deposition testimony is merely a retelling of information already in the AR and does not amplify or correct findings made in NCL's responsibility evaluation, it is not an appropriate supplement to the AR. Furthermore, Lt. Col. MacIntyre was deployed out of Afghanistan in October, 2010, and his testimony offers an incomplete picture of NCL's performance under the HNT contract, which concluded in September, 2011. Tab 172 at 22569. After Lt. Col. MacIntyre left Afghanistan, the Army notified NCL of additional

---

[16] The parties have not sought to include in this record any materials from the ASBCA litigation other than Mr. Epstein's expert report, the revised final decision, and a deposition.

[17] Tab 161 at 21668-78 is a redacted transcript of a portion of Lt. Col. MacIntyre's deposition. Tab 172 at 22515-70 is the complete, unredacted transcript.

[18] By agreement of the parties, the following documents are added to the AR: Tabs 133-35 and 141. As explained above, the Court determined that Tabs 137, 139, and 142, which include communications between NCL and Lt. Col. MacIntyre, are properly included in the AR because they reflect NCL's HNT performance and corrective action.

17

performance shortcomings, including noncompliance with ITV requirements and use of an unauthorized private security contractor. See NCL 3. Because he did not observe the entirety of NCL's performance, Lt. Col. MacIntyre's testimony does not accurately evaluate NCL's overall performance on the HNT contract and is not properly added to the AR.

### III. Documents Relating to NCL's Alleged Relationship with Watan

NCL also seeks to supplement the AR with documents relating to any suggestion that NCL has a contract relationship with Watan. The contracting officer cited NCL's use of Watan, an unauthorized security subcontractor, as a basis for NCL's nonresponsibility determination, stating:

> NCL was issued a Letter of Concern dated 23 May 2011 under [the HNT contract] for failure to utilize an authorized PSC during a mission which was a direct violation of the contract requirements. This further substantiates NCL's lack of accountability in fulfillment of the contract requirements.

NCL 5. The May 23, 2011 letter of concern described an incident in which an NCL truck was escorted by Watan, and an NCL employee's comment that "it was common practice to switch to Watan PSC, when convoys moved South of Ghazni." Tab 151 at 21532. From this, the HNT contracting officer concluded that a relationship existed between NCL and Watan and requested that NCL provide a response, including "[a]n explanation of how long [Watan] has been escorting NCL trucking missions." Id. NCL responded, stating:

> NCL does not have and has never had a subcontract with [Watan] under its Host Nation Trucking Contract. NCL accordingly has not engaged [Watan] to escort its trucking missions directly. NCL's trucking contractors hire the security providers, and NCL has provided each of its trucking subcontractors written instruction to refrain from using [Watan] on their HNT missions.

AR 16329.

Despite NCL's arguments to the contrary, the NAT contracting officer concluded in her nonresponsibility determination that NCL had not substantiated that [
              ] NCL 8. The contracting officer further concluded that [


                                                                                          ]
. ." NCL 9.

NCL requests supplementation of the AR with a host of documents pertaining to the contracting officer's suggestion that NCL had a continuing relationship with Watan. These materials fall into six categories:

1) Communications between NCL and the Army Relating to NCL's Relationship with Watan

2) NCL's Subcontracts with Trucking Companies

3) Materials Pertaining to Mirzada Transport & Logistics Co.'s ("MTC") Relationship with Watan and NCL's Contract Dispute with MTC

4) Transcript of a September 15, 2011 Hearing Held by the House Oversight and Government Reform Subcommittee on National Security, Homeland Defense and Foreign Operations on Defense Department Contracting in Afghanistan

5) NCL's Notes from Meetings with the Army in 2009

6) Declarations from NCL's Former Vice President and President and Owner.

## 1) Communications between NCL and the Army Relating to NCL's Relationship with Watan (Tabs 144, 152, 153, 171)

NCL seeks to include its correspondence responding to the Army's May 23, 2011 letter of concern and documents referenced in that letter. Specifically, NCL requests supplementation with a May 12, 2011 letter it sent to the HNT contracting officer denying NCL ever had a subcontract with Watan and attaching notices to its subcontractors to refrain from using Watan for HNT contract services. Tab 171 at 22514, Tab 144 at 21506-11, Tab 153 at 21539-44. NCL also seeks to include the following additional responses to the May 23, 2011 letter of concern: (1) two memoranda authored by NCL's employee John Smith indicating that NCL's trucking subcontractor that joined the Watan-escorted convoy did not have a contract with Watan to provide convoy security, (2) an incident report regarding the truck escorted by Watan, (3) amendments to NCL's subcontracts prohibiting use of Watan, and (4) a purported subcontract between NCL's subcontractor B&Q and security subcontractor Salarzai. Tab 152 at 21533-35, Tab 153 at 21536-56.[19]   Because this material was part of NCL's response to the HNT contracting officer's request for further information regarding NCL's relationship with Watan, it is properly added to the AR.   See Acrow Corp. v. United States, 96 Fed. Cl. 270, 277 (2010) ("Without encroaching on the broad discretion afforded a contracting officer's responsibility determination, the court may supplement the record where necessary to review the contention that the contracting officer did not pursue impeaching material bearing on issues that she deemed important, provided that it was at the time as readily available as the material that she considered.").

## 2) NCL's Subcontracts with Trucking Companies (Tabs 126, 130, and 131)

NCL asks that its subcontracts with Mirzada Transport Logistics Co. ("MTC"), Shneez Transportation Services, and Gulalai Transportation Company, for services on the HNT contract be added to the record, presumably to support an inference that if NCL had these other subcontracts, it did not have a subcontract with Watan.   See Tab 126 at 21289-322, Tab 130 at

---

[19] The document that NCL identifies as a subcontract between B&Q and Salarzai is not in English, but the parties do not dispute that the proffered document was correctly identified.

21343-83, Tab 131 at 21384-419.  The NAT contracting officer, however, did not find that NCL had a [                                    ] -- she found that NCL had [                    ] and had not substantiated that [                                          ].  NCL's formal subcontracts with these other companies are not probative [                              ].  As such, they are not necessary for effective judicial review of the responsibility determination.

### 3) Materials Pertaining to MTC's Relationship with Watan and NCL's Contract Dispute with MTC (Tabs 128, 132, 138, 143, 149, and 156)

Plaintiff seeks to supplement the AR with documents pertaining to NCL's contract dispute with its subcontractor, MTC, and MTC's subcontract with Watan.  These materials include (1) four letters describing the termination of NCL's subcontract with MTC in December, 2009[20] and NCL's withholding of payment owed to MTC after MTC's Chief Executive made statements to the media confirming that MTC made payments to the Taliban, (2) NCL's response to a Congressional investigation indicating that MTC used Watan for convoy security, and (3) email exchanges between NCL and the Army and NCL and MTC pertaining to an Army request for identification of NCL's armed employees, including Watan.  See Tab 128 at 21330-32,[21] Tab 132 at 21420-33, Tab 138 at 21483-85, Tab 143 at 21503-5, Tab 149 at 21518-29 and Tab 156 at 21608-11.

Plaintiff's request to supplement the AR with these materials is unfounded.  The proposed materials do not discredit or correct the contracting officer's business judgment that "it has not been substantiated that the [                                        ] NCL 12.  While Plaintiff suggests that NCL necessarily [                              ] when it terminated its subcontract with MTC on December 5, 2009, the termination of NCL's subcontract with MTC does not establish [                                        ].

Moreover, in its motions to supplement, Plaintiff ignored classified material regarding [                                        ]  The documents NCL seeks to add to the AR are more remote and less probative than information in the classified AR the contracting officer relied upon which addressed [                                    ] in some detail.  Citing [        ] reporting, the contracting officer determined that [                                        ] NCL 8.  The contracting officer referenced [                              ] indicating that [                              ]   NCL 12-13.  The contracting officer also noted based upon [      ] reporting that [

---

[20] NCL and MTC agreed to terminate their contract after MTC had failed to submit HNT mission sheets to NCL in a timely manner, MTC had failed to deliver cargo, and MTC indicated it would begin to work with other HNT prime contractors, in contravention of its exclusivity agreement with NCL.  Tab 132 at 21420-21.

[21] Tab 128 also includes email exchanges between NCL and its subcontractors that do not reference Watan.  Tab 128 at 21333-38.

] NCL
13. The contracting officer found that "NCL Holdings' [                    ] . . . confirmed that
[
                                        ] and that [

                                        ]   NCL   13.   This   peripheral
information regarding MTC does not alter or correct the [                    ] on which the
contracting officer relied.  The Court denies supplementation with Tabs 128, 132, 138, 143, 149,
and 156.

### 4) Transcript of a September 15, 2011 Hearing Held by the House Oversight and Government Reform Subcommittee on National Security, Homeland Defense and Foreign Operations on Defense Department Contracting in Afghanistan (Tab 157)

NCL also requests supplementation with the transcript of a September 15, 2011
congressional hearing on corruption and DoD contracting in Afghanistan that postdated NCL's
responsibility determination.  See Tab 157 at 21612-57.  The transcript includes the global
assertion that HNT contractors made payments to insurgents and warlords for convoy security in
Afghanistan, but does not identify NCL specifically.  Moreover, the transcript is duplicative of
information in [    ]'s report, which states: [

                                        ] NCL 165.  As
such, this transcript is not necessary for effective judicial review of NCL's nonresponsibility
determination.  See PlanetSpace, Inc. v. United States, 90 Fed. Cl. 1, 9-10 (2009) (denying
supplementation with paragraphs of a declaration that are "duplicative of material in the existing
record, and their omission would not 'frustrate effective judicial review.'") (citing Axiom, 564
F.3d at 1381); Kerr Contractors, Inc. v. United States, 89 Fed. Cl. 312, 335 (2009) (denying
supplementation with a requested declaration that is duplicative of information in the AR
because it "add[s] nothing to a record which already presents such information.").

### 5) NCL's Notes from Meetings with the Army in 2009 (Tabs 127 and 129)

The Court denies supplementation with notes taken by NCL's personnel at meetings with
the Army.  See Tab 127 at 21323-29, Tab 129 at 21339-42.  These notes do not reference [
                            ] and Plaintiff has not laid the evidentiary foundation for these
documents.  See L-3 Commc'ns Integrated Sys., L.P., 91 Fed. Cl. at 358.  NCL did not submit a
declaration authenticating the notes or substantiating that they were made contemporaneously
with the meetings they purportedly describe.  Nor did NCL provide these notes to the NAT
contracting officer for consideration in NCL's responsibility determination.  See Calloway v.
Harvey, 590 F. Supp. 2d 29, 39 (D.D.C. 2008).

### 6) Declarations from NCL's Former Vice President and President and Owner (Tabs 159 and 160)

The declarations from NCL's employees, Steve Potter, NCL's former Vice President for
Business Development, and Hamed Wardak, NCL's president and owner, describe the NCL

employees' interviews in March, 2010, with an investigator for the House Subcommittee on Homeland Security regarding NCL's and its subcontractors' relationships with Watan.  Tab 159 at 21659-63, Tab 160 at 21664-67.  These declarations were prepared in October, 2011, two months after NCL's nonresponsibility determination and were not before the contracting officer when she conducted her responsibility review.  The declarations detail NCL's investigation of rumors that its subcontractors were making payments to the Taliban and MTC's relationship with Watan.  The proposed materials do not discredit or correct the contracting officer's business judgment that NCL had not substantiated that [                                                                            ].  Because these materials are not necessary for effective judicial review of NCL's responsibility determination, the Court denies supplementation with the declarations from NCL's employees.

**Plaintiff's Motion to Supplement the Court Record**

Plaintiff also seeks to supplement the Court's record with the decision of the Army's SDO terminating the referral for proposed debarment of GMT, another HNT contractor.  GMT was referred for proposed debarment based on allegations that GMT forged TMRs and submitted false claims during performance of the HNT contract.  On January 31, 2012, the SDO terminated the proposed debarment of GMT, stating:

> Army records and statements are insufficient to prove fraud.  The statements provided by the receiving unit representatives contain numerous inconsistencies and contradictions; and thus, lack sufficient reliability and credibility.  First, the statements, individually or in combination, fail to support a finding that GMT more likely than not committed fraud.  These statements merely indicate that there is no unit record available to verify certain GMT TMRs.  Hence, they fail to eliminate other plausible causes for the lack of unit records, including misplaced or lost records, or fuel missions re-directed to other locations. . . . Second, the statements are inconsistent and contradicted by other evidence . . . .

Pl.'s Mot. to Supplement the Court R. Ex. 1 at 8-9.[22]  The SDO detailed statements by Army representatives that were either inconsistent with or contradicted by TMRs produced by GMT indicating that Army personnel had actually signed the TMR in question.  Id. at 9-10.  The SDO further concluded "[i]n the present case, there is a lack of direct or circumstantial evidence showing that . . . GMT, its owner, or its employees falsified any TMRs with the intent to defraud the U.S. government."  Id. at 10.

Plaintiff claims that the SDO's decision should be added to the Court's record because the SDO's findings confirm a pattern of Army attempts to blacklist or otherwise exclude HNT prime contractors, the absence of any motive of HNT contractors to submit forged mission sheets, and the inconsistency and unreliability of Army records.  Plaintiff's argument fails because the SDO's termination of GMT's referral for proposed debarment is immaterial to this protest.  Debarment proceedings are individualized assessments, tailored to the unique

---

[22] Attachment 1 to Plaintiff's motion to supplement the Court's record includes separately paginated documents.  The Court adopts the pagination generated by the CM/ECF filing system for citation purposes.

circumstances of each contractor. GMT was referred for proposed debarment based on allegedly forged TMRs submitted to the Army to obtain payment for fuel deliveries that GMT never completed. To rebut the allegations in the referral, GMT submitted documentation to the SDO, including actual TMRs and ITV records. Based on this particularized evidence, the SDO determined that there was insufficient evidence of fraud to warrant GMT's debarment. The SDO also concluded that in certain cases, there was no record to verify GMT's TMRs because the Army had misplaced or lost records or re-directed fuel missions to other locations. The SDO's findings in GMT's case based on GMT's evidence and some lost records are not probative of allegations that a different contractor, NCL, forged TMRs. As such, the Court denies NCL's motion to supplement the court record with the Army SDO's decision terminating GMT's proposed debarment.

### The Parties' Motions for Judgment on the Administrative Record

### The Army's Responsibility Determination Was Reasonable

NCL alleges that the contracting officer's responsibility determination was unreasonable in several respects. NCL claims that the contracting officer's reliance on NCL's vendor vetting assessment was unreasonable because [     ] reporting was outdated and inaccurate, the vendor vetting program resulted in NCL's de facto debarment without affording it due process, and the Army failed to notify NCL of its vendor vetting rejected status, as required by the vendor vetting regulations. NCL further claims that NCL's performance concerns individually and in the aggregate were insufficient to deem NCL nonresponsible, and that it satisfactorily answered and addressed every cure notice and letter of concern cited by the contracting officer in the nonresponsibility determination. NCL also alleges that its nonresponsibility determination was a pretext for "blacklisting" the HNT contractors. Finally, NCL complains that the contracting officer improperly found NCL to be nonresponsible by treating it an unequal and disparate manner as compared to Anham, an HNT contractor that was deemed responsible. Although the Court addresses each of the contentions in turn, at the outset the Court notes that, on the whole, the evidence on which the contracting officer relied to find NCL nonresponsible was substantial and compelling. Under the FAR, when evaluating a prospective contractor for responsibility, a contracting officer "shall make a determination of nonresponsibility" if there is an "absence of information clearly indicating that the prospective contractor is responsible." FAR 9.103(b) (emphasis added). In this case, the record does not support a conclusion that NCL provided "information clearly indicating" that NCL was responsible.

### The Contracting Officer Reasonably Relied On NCL Holdings' Vendor Vetting Rating

NCL contends that the contracting officer's reliance on its [          ] vendor vetting rating -- which rendered NCL ineligible for award -- was irrational because [     ] conclusions were inaccurate. In NCL's nonresponsibility determination, the contracting officer cited [     ] findings that NCL Holdings, LLC was [

                                                                    ]. Specifically, the contracting officer stated:

A review of the supporting [                    ] report for NCL indicates [

                                                              ] This is supported by
the [    ] report dated 29 June 2011. [

        ] further substantiates NCL's inability to maintain integrity and business ethics
while performing transportation services in the Afghanistan area of operation; an area
rife with bribery, corruption, and criminal activity.

NCL 8-9.

        NCL has failed to demonstrate that the contracting officer's reliance on [        ] vendor
vetting assessment was irrational.  As an initial matter, the contracting officer not only was
entitled to rely upon [            ] report and rating in her nonresponsibility evaluation, she was
required to do so.  See REF 75-76, 231.  The FRAGO requires that contracting officers consult
[     ] vendor vetting assessment, stating: "When a "rejected" vendor has submitted a proposal
and under the evaluation criteria a rejected vendor would be the apparent awardee of the
contract, the contracting officer must skip the rejected vendor and award the contract to the next
responsible and vetted vendor."  REF 233.  [

        ] REF 224.  A [                    ] is not a matter to be taken lightly.  The classification of
a vendor as "HIGH" or "EXTREMELY HIGH" risk requires a "Validation Panel" to determine
whether the vendor should be "approved" or "rejected" within three days "by considering the
[            ] assessment and other relevant information."  REF 231.  Here, the agency's rating for
NCL was based on a three-tiered process -- the initial [                    ] assessment, the
Validation Panel's consideration and confirmation of that assessment, and the agency's refusal to
waive the "rejected" contractor's ineligibility.

        As the Comptroller General has recognized, information in investigative reports may be
used as the basis of a nonresponsibility determination.  See Frank Cain & Sons, Inc., B-236893,
1990 WL 277550, at *2 (Comp. Gen. Jan. 11, 1990) (noting that a contracting officer was not
required to conduct an independent investigation of a criminal investigative report before using it

in a nonresponsibility determination); cf. Guardian Moving & Storage Co., Inc. v. United States, 31 Fed. Cl. 645, 648-49 (1994) (upholding contracting officer's reliance on assurances from the Interstate Commerce Commission regarding a licensing issue).   Nonetheless, NCL seeks to overturn its nonresponsibility determination on the grounds that [         ] conclusions were inaccurate and based on outdated [                    ].   Specifically, NCL contends that [      ] conclusions were based on data from 2009, that was obsolete when [     ] prepared its report for NCL Holdings, LLC in July, 2011.   [     ] assessment was based upon [



]

Contrary to Plaintiff's assertions, it was not arbitrary and capricious for the contracting officer to rely upon [                    ] reports that were two years old in her responsibility determination.   See MCI Constructors, Inc., B-240655, 1990 WL 293560, at *2-3 (Comp. Gen. Nov. 27, 1990) (affirming contracting officer's reliance in nonresponsibility determination upon company's termination for default two years previously, especially where the contracting officer also considered more recent performance); Reel-O-Matic Sys., Inc. v. United States, 16 Cl. Ct. 93, 100-101 (1989) (upholding Small Business Administration's refusal to issue certificate of competency after considering adverse past performance on prior contract occurring roughly five years prior to the decision, among other factors); cf. CRAssociates, Inc. v. United States, 95 Fed. Cl. 357, 386-87 (2010) (noting that Government could not relieve bidder of solicitation's requirement of providing past performance data going back three years).

In any event, NCL has failed to show that the [                ] assessment on which the contracting officer relied was inaccurate.   Indeed, NCL has failed to acknowledge instances where it has not attempted to refute the [          ] assessment.   For example, while NCL argued [

]  -- it did not dispute that [

].   Pl.'s Classified Annex to Mot.

for J. on the Admin. R. 15-16.

### The Vendor Vetting Procedure Did Not Deprive NCL of Due Process

Plaintiff further contends that the contracting officer improperly relied upon NCL's vendor vetting rating because that rating resulted from an illegal process.   NCL alleges that the vendor vetting program does not comport with due process because a "rejected" contractor like NCL is prohibited from receiving any contract awards without notice of, or an opportunity to respond to, its "rejected" status.   In a similar vein, Plaintiff contends that the vendor vetting process fails to provide the procedural safeguards in FAR Subpart 9.4 governing the debarment, suspension, and ineligibility of contractors.   Specifically, NCL claims that the vendor vetting program resulted in its de facto debarment because it rendered NCL ineligible not only for the NAT procurement but for all Department of Defense ("DoD") contracts in Afghanistan, NCL's primary source of business, for up to one year.

These allegations raise an issue about the extent of this Court's authority to entertain and remedy Plaintiff's claim of de facto debarment.  Under 28 U.S.C. § 1491(b)(1), this Court has bid protest jurisdiction to "render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."  28 U.S.C. § 1491(b)(1) (2006).  In Distributed Solutions, Inc. v. United States, the Federal Circuit broadly defined the phrase "in connection with a procurement or proposed procurement," stating that it "involves a connection with any stage of the federal contracting acquisition process . . . ."  539 F.3d 1340, 1346 (Fed. Cir. 2008).  Where a claim of de facto debarment is raised as a ground of protest (and not as an isolated claim to nullify the debarment), this Court may consider allegations of de facto debarment in exercising its bid protest jurisdiction.  See TLT Const. Corp. v. United States, 50 Fed. Cl. 212, 215-16 (2001) (exercising jurisdiction in post-award bid protest over plaintiff's claim that failure to pursue discussions with plaintiff concerning its past performance constituted de facto debarment); CRC Marine Servs, Inc. v. United States, 41 Fed. Cl. 66, 68 (1998).

Here, because NCL's vendor vetting rating was a basis for NCL's responsibility evaluation, which was conducted in the challenged NAT procurement, a constitutional challenge to that vetting process predicated on a denial of due process is fair game.  This is analogous to the Court's review of a corrective action an agency takes pursuant to a Government Accountability Office ("GAO") recommendation following a successful GAO protest.  While this Court lacks jurisdiction to review a GAO decision outright, it may assess whether the GAO decision was rational in order to determine whether the procurement action being challenged -- the agency's corrective action predicated on that GAO decision -- was reasonable.  See Honeywell, Inc. v. United States, 870 F.2d 644, 647-48 (Fed. Cir. 1989) (stating that in deciding whether an agency justifiably followed GAO's recommendation, the controlling inquiry is whether GAO's decision was rational and cautioning against de novo review of the basis for GAO's determination); Centech Grp., Inc. v. United States, 78 Fed. Cl. 496, 507 (2007) (determining that "to the extent that the agency relied upon GAO's decision as a basis for taking corrective action, GAO's decision is pivotal for the Court's review of the agency's procurement decision."); Advance Constr. Servs., Inc. v. United States, 51 Fed. Cl. 362, 365 (2002) (reaffirming "the well-settled principle that 'it is the agency's decision, not the decision of the GAO, that is the subject of judicial review' when a bid protestor protests an award previously reviewed by the GAO.") (quoting Chas H. Tompkins Co. v. United States, 42 Fed. Cl. 716, 719 (1999)).  Here too, while [      ] determinations would not generally be reviewable in this forum, this Court may consider [      ] vendor vetting rating process to the extent the resultant vendor vetting rating was a basis for the contracting officer's nonresponsibility determination.[23]

Plaintiff argues that the contracting officer acted arbitrarily and capriciously in relying on [      ] vendor vetting assessment because [      ] vendor vetting rating constituted a de facto debarment and deprived NCL of due process.  Specifically, NCL complains that the vendor vetting process "left [NCL] in the dark with no opportunity to learn or confront the allegations against it, no opportunity to provide supplemental information normally used to mitigate or

---

[23] Similarly, Plaintiff has standing to challenge its [      ] vendor vetting rating insofar as that rating was a basis for its nonresponsibility determination in this procurement.

lessen the gravity of an offense, and no opportunity to seek reconsideration of the Vetting Program's conclusion." Pl.'s Classified Annex to Reply-Response 1-2.

A disappointed bidder alleging <u>de facto</u> debarment must show evidence demonstrating that the agency will not award the contractor future contracts. <u>See</u> <u>TLT Const. Corp.</u>, 50 Fed. Cl. at 215-16 (recognizing that Plaintiff must demonstrate a "'systematic effort by the procuring agency to reject all of the bidder's contract bids'") (quoting <u>Stapp Towing Inc. v. United States</u>, 34 Fed. Cl. 300, 312 (1995)).  In the seminal case of <u>Old Dominion Dairy Products, Inc. v. Secretary of Defense</u>, the D.C. Circuit found that where the agency denied a contractor two substantial contracts based on the determination that plaintiff lacked integrity and "effectively put [plaintiff] out of business," the contractor was entitled to notice of the charges so as to afford the contractor the opportunity to respond.  631 F.2d 953, 963-68 (D.C. Cir. 1980); <u>see</u> <u>Leslie & Elliot Co., Inc. v. Garrett</u>, 732 F. Supp. 191, 198 (D.D.C. 1990).

Because NCL's ineligible rating resulting from the vendor vetting process effectively deprived NCL of future DoD contract awards in Afghanistan for up to one year, its vendor vetting rating operates as a <u>de facto</u> debarment.  Where, as here, the Government effectively bars a contractor from receiving contract awards and threatens the contractor's livelihood, the Government infringes upon the contractor's constitutionally protected liberty interest.  <u>See</u> <u>Old Dominion</u>, 631 F.2d at 966-67 (holding that the Government's denial of contract awards that resulted in foreclosure of government employment opportunities for a contractor implicates a liberty interest recognized by the Fifth Amendment); <u>see also</u> <u>Trifax Corp. v. District of Columbia</u>, 314 F.3d 641, 644 (D.C. Cir. 2003) (stating that Government stigmatization that broadly precludes individuals or corporations from a chosen trade or business deprives them of a constitutionally protected liberty interest).   In these circumstances, the deprivation of a contractor's protected liberty interest triggers procedural due process rights under the Fifth Amendment.  <u>Old Dominion</u>, 631 F.2d at 966.

Due process normally requires that a contractor receive notice of the charges impugning its integrity and an opportunity to be heard.  <u>See</u> <u>Old Dominion</u>, 631 F.2d at 968; <u>Leslie & Elliot Co. Inc.</u>, 732 F. Supp at 198.  However, the requirements of due process vary given the circumstances.  <u>See</u> <u>Morrissey v. Brewer</u>, 408 U.S. 471, 481 (1972) ("[D]ue process is flexible and calls for such procedural protections as the particular situation demands.").  Although the vendor vetting rating process does not provide a contractor either notice of its ineligible status or an opportunity to present rebuttal evidence, requiring traditional due process in the [    ] rating process would adversely affect national security.  In the environment of a warzone when the required notice would necessarily disclose classified material and could compromise national security, normal due process requirements must give way to national security concerns.  Not only would affording due process here require disclosure of classified information and endanger military intelligence sources, it would provide information to entities that pose a potential threat to the United States, thereby placing United States forces and operations at risk.

The Tucker Act's jurisdictional grant specifically instructs this Court to give due consideration to national security interests in exercising its bid protest jurisdiction.  <u>See</u> 28 U.S.C. § 1491(b)(3) (2006) ("In exercising jurisdiction under this subsection, the courts shall give due regard to the interests of national defense and national security . . . .").  As the D.C.

Circuit recognized, basic elements of due process such as "notice, grounds, opportunity to respond and be heard" are subject to "essential national security considerations." Gonzalez v. Freeman, 334 F.2d 570, 580 n.21 (D.C. Cir. 1964); cf. Snepp v. United States, 444 U.S. 507, 509 n.3 (1980) ("The Government has a compelling interest in protecting both the secrecy of information important to our national security and the appearance of confidentiality so essential to the effective operation of our foreign intelligence service."); Martin v Lauer, 686 F.2d 24, 34 (D.C. Cir. 1982) (recognizing that the government's interest in nondisclosure in the Freedom of Information Act context is "perhaps greatest when government information concerns national secrets.").

Here, the interests of national security preclude the Government from divulging classified military intelligence to entities regarded as potential threats to United States military forces. See Makky v. Chertoff, 541 F.3d 205, 217-18 (3d Cir. 2008) (discharged employee of Transportation Security Administration was not entitled to notice of classified allegations leading to his termination, because agency was prohibited by law from releasing the information); see also 18 U.S.C. § 798 (2006) (criminalizing unlawful release of classified information); Exec. Order No. 13256, 75 Fed. Reg. 707, 726 (Dec. 29, 2009) ("Officers and employees of the United States Government, and its contractors . . . shall be subject to appropriate sanctions if they knowingly, willfully, or negligently: (1) disclose to unauthorized persons [classified] information . . . .").

The statutory mandate in 28 U.S.C. § 1491(b)(3) that this Court give due regard to the interests of national defense and national security coupled with precedent indicating that national security concerns trump due process rights dictate a ruling that [   ] was not required to provide any additional procedural safeguards to NCL as part of the vendor vetting process. See Cafeteria & Rest. Workers Union, Local 473 v. McElroy, 367 U.S. 886, 896 (1961) (holding that no hearing was required where Navy revoked employee's security clearance because the governmental function at issue was "to manage the internal operation of an important federal military establishment.") (citations omitted).

In sum, although NCL's vendor vetting rating process precluded NCL from being eligible for DoD contracts in Afghanistan for up to one year, given national security interests, NCL was not entitled to receive formal notice of, or an opportunity to respond to, its vendor vetting rating. As such, the contracting officer reasonably relied on [   ] assessment in NCL's responsibility evaluation.

### The Army Was Not Required to Notify NCL of Its Rejection Under the Vendor Vetting Procedures

NCL alleges that the Army failed to follow the vendor vetting procedures when it did not notify NCL during its August 10, 2011 debriefing that it had been "rejected" and failed to advise NCL of its right to reconsideration. NCL's argument hinges on its contention that it should have been deemed an "apparent successful offeror" within the meaning of the Acquisition Instruction at the time of its August 10, 2011 debriefing. The Acquisition Instruction requires:

If, and only if, the rejected apparent successful offeror requests a debriefing, inform them of the following, in writing, after coordinating with CJA:

"You were determined to be ineligible for award of subject contract by United States Forces – Afghanistan/Iraq.  You may submit a written request for reconsideration of this determination to USFOR-A/USF-I, through the Contracting Officer, within 60 calendar days of this notification."

REF 76 (emphasis added).  Otherwise, upon confirmation that a vendor is rejected, the contracting officer "shall bypass the rejected offeror and consider the next best offeror in the competitive range for award."  Id.  The Acquisition Instruction states that "[i]f an offeror is not the apparent successful offeror, follow normal procedures. **DO NOT MENTION THEIR INELIGIBILITY[.]**"  Id.

On August 10, 2011, the date on which Plaintiff claims it should have been informed of its [    ] "rejected" status at its debriefing, NCL was not an "apparent successful offeror."  The label of apparent successful offeror typically applies to an offeror that has satisfied all requirements for award at a given point in time.  Here, the contracting officer had already notified NCL prior to August 10, 2011, of "adverse information" concerning NCL's past performance, including forgery, fraud, failure to comply with ITV requirements, and noncompliance with HNT contract requirements.  By letter dated July 30, 2011 (revised on August 1, 2011), the contracting officer notified NCL that it was being evaluated for responsibility and listed areas of concern relating to NCL's performance, characterizing these concerns as "adverse information which may impact the responsibility determination."  AR 16239-41, 16249-51.  Importantly, when it requested a debriefing on August 10, 2011, Plaintiff was already aware that it had been deemed nonresponsible and rejected from the NAT procurement.  NCL received notification of the Army's nonresponsibility determination on August 9, 2011.  See AR 16367-70, 16373-74. Because NCL was not an "apparent successful offeror" on August 10, 2011 when it received its written debriefing, the contracting officer was under no obligation to notify NCL in its written debriefing that it had an opportunity to request reconsideration of its [    ] vendor vetting rating.

In this Court's view, the classified record and NCL's ineligibility due to its vendor vetting rating provides ample support for the contracting officer's determination that NCL was nonresponsible.  Nonetheless, the Court addresses NCL's additional challenges to the nonresponsibility determination.

### The Contracting Officer Reasonably Considered NCL's Unsatisfactory ITV Utilization

NCL also had an unsatisfactory record of ITV use -- the requirement that carriers install satellite-based tracking devices on cargo trucks -- that raised serious doubts as to its reliability to perform in a warzone.  The HNT statement of work required that "[a]ll vehicles used in support of HNT missions must have [an ITV] device . . . ."  AR 21259.  Despite this requirement, NCL's average rate of ITV use for one four-week period was only 19%, according to a December 22, 2009 letter of concern.  AR 21434-35.  In its response to this letter of concern, NCL did not dispute its low ITV utilization rate and outlined a corrective action plan.  See AR 16268-69.  However, NCL's corrective action failed to remedy its low ITV use rates, as evidenced by a cure

notice issued on March 12, 2010. See AR 21501. The cure notice stated that between February 12, 2010, and March 6, 2010, NCL's utilization rate fluctuated between 24.94% and 39.51%. Id. NCL again conceded that its performance in this regard was unsatisfactory, responding that "NCL's recent performance as it relates to GDMS performance has dropped significantly, and, as you acknowledge, is not acceptable to you, nor is it acceptable to NCL." AR 16272.

NCL contends that its ITV use improved significantly and that its average ITV use was 93.26% during the 16-month period from April 2010 to July 2011, but NCL's improved performance does not alter its earlier failure to comply with the HNT contract's ITV requirements. AR 16260-61.

### The Contracting Officer Reasonably Considered NCL's Forged Mission Sheets and Pilferage

The contracting officer also determined that NCL was nonresponsible based on a December 22, 2009 letter of concern regarding forged mission sheets, pilferage, and non-compliance with ITV requirements. NCL 6-7. Although NCL contends there is no support for agency allegations of forgery, in its December 29, 2009 response, NCL did not deny that it had committed forgeries and blamed the Government for requiring contractors to use hardcopy mission sheets, stating "[t]he use of hardcopy mission sheets in this environment is subject to considerable risk of loss of such sheets, forgery, as you note in the [letter of concern] and even holding hostage of such sheets on the mistaken belief that they allowed leverage to get paid." AR 16268.

The Army's letter also identified three failed cargo missions with losses totaling $50,648.20 and eight failed fuel missions. See AR 21434. In its response, NCL did not deny that pilferage had occurred or that it had failed eight fuel missions.[24] See AR 16269-70. While NCL argues that these problems were "de minimis" in light of NCL's entire record of performance on the HNT contract, the contracting officer's contrary business judgment was reasonable.

### Transponder Stacking and NCL's Referral for Proposed Debarment

The contracting officer also found NCL nonresponsible because NCL's subcontractor engaged in transponder stacking. On October 18, 2010, the Army confiscated 17 NCL mission sheets and 17 transponders from one vehicle driven by an employee of NCL's subcontractor, the Times Group. AR 16277. Of the 17 transponders confiscated, six registered a required load date of October 17, 2010, and pinged on this date, indicating that their assigned trucks were "awaiting upload at origin." Id. Because the six transponders were located in one vehicle, however, their corresponding trucks were, in fact, not awaiting upload at origin -- there were no additional trucks. The Army also found that 10 of the remaining 11 transponders confiscated had been

---

[24] Subsequently, NCL contested its liability for failed fuel missions before the ASBCA, but in its response to the Army's letter of concern, NCL did not deny that it had failed the eight fuel missions identified by the contracting officer.

assigned to one HNT mission sheet found in the same vehicle. Id. On October 19, 2010, the Army notified NCL of this incident in a letter of concern, and NCL admitted in a letter dated October 23, 2010, that it had engaged in transponder stacking. AR 16277, 16274.

NCL argues that the contracting officer's reliance on transponder stacking as a basis for NCL's nonresponsibility determination was irrational because NCL subsequently terminated the subcontractor that was responsible and retrained its employees. AR 16275. Nonetheless, NCL partnered with the subcontractor it claims was responsible for engaging in transponder stacking again in its proposal for the NAT contract. See AR 4632-33. In any event, the contracting officer's decision to deem NCL nonresponsible based on even one instance of fraudulent conduct was reasonable. This type of assessment is a quintessential business judgment, and this Court will not second-guess the contracting officer's judgment where there is supporting evidence.[25] See Bender Shipbuilding, 297 F.3d at 1362; Ettefaq-Meliat-Hai-Afghan Consulting, Inc. v. United States, 106 Fed Cl. 429, 436-37 (2012); News Printing Co., 46 Fed. Cl. at 746.

### Withheld Payments

The contracting officer also concluded that NCL was nonresponsible because the Army withheld $22,286,118.28 from NCL under the HNT contract, "for a combination of failed missions, Cancelled No Pay Missions, Pilferage/Backcharges and Fuel Backcharges," of which $5,272,125.20, was attributable to "NCL's performance failures." NCL 8. NCL contends that it is not liable for $5,272,125.20 because the Government reduced NCL's withholding based on 61 allegedly failed fuel missions by $863,547.31 in a contracting officer's revised final decision dated August 10, 2011. See AR 21557. However, the Army also withheld payments for NCL's other performance shortcomings, including cancelled no-pay missions and pilferage/backcharges. Even if NCL's withholding of $5,272,125.20 were reduced by $863,547.31, these withheld payments were substantial and, considered with NCL's overall HNT performance, provided a reasonable ground for the contracting officer's nonresponsibility finding.[26]

---

[25] NCL's transponder stacking led to its referral for debarment, another development the contracting officer relied on in her nonresponsibility determination. According to the responsibility determination, NCL was referred for proposed debarment based on "numerous acts of criminal misconduct such as transponder stacking . . . ." NCL 8. However, the referral for proposed debarment was based on NCL's single admitted incident of transponder stacking. The Government has conceded that the contracting officer's finding in the nonresponsibility determination that NCL engaged in reoccurring instances of transponder stacking was an error. Def.'s Cross Mot. for J. on the Admin. R. 20. NCL has not shown that the contracting officer's erroneous reliance on "reoccurring" instances of transponder stacking tainted the remainder of its nonresponsibility determination or that, absent this error, it should have been found responsible.

[26] The contracting officer also found that NCL lacked a satisfactory performance record because its use of "NWTC as a subcontractor under NCL's HNT contract resulted in . . . negative feedback from the customer, specifically relative to the subcontractor's ability to meet contractual requirements and timelines." NCL 6. The Government has conceded that the contracting officer's reference to problems with NWTC in NCL's responsibility evaluation was (footnote continued on next page)

**The Contracting Officer Reasonably Concluded that NCL Failed to Comply with PSC Arming Requirements**

The contracting officer also concluded that NCL was nonresponsible based on NCL's noncompliance with PSC arming requirements, as detailed in a cure notice dated January 1, 2010, and two letters of concern dated February 1, 2010, and June 24, 2010. NCL 4, 5. In response to the June 24, 2010 letter of concern, NCL stated it was in the process of complying with this contractual requirement. Although the Army had by this time authorized NCL to submit arming information, NCL had yet to enter all the required information into the Army's tracking system, and NCL indicated it would not be fully compliant with all the PSC arming requirements until August 31, 2010. See AR 16336. While this deficiency standing alone might not suffice to render a contractor nonresponsible, in the overall context here NCL's failure to comply with PSC arming requirements, spanning eight months, supports the contracting officer's conclusion that NCL "lack[ed] . . . commitment and responsibility to properly administer and perform in accordance with the contract requirements without significant involvement from the U.S. Government." NCL 5.

**The Contracting Officer Reasonably Considered NCL's Corrective Action**

NCL argues that it satisfactorily addressed the Army's concerns with its HNT performance, but the NAT contracting officer did not credit NCL's corrective actions. However, the contracting officer reasonably concluded that NCL's documented record of nonperformance outweighed its corrective action after considering the barrage of cure notices and letters of concern detailed in the nonresponsibility determination and NCL's responses and corrective action. Although NCL attempted to improve its performance and did implement some corrective action, the record clearly establishes that NCL had significant lapses in its required performance under the HNT contract. Where a contractor's performance has been unsatisfactory, its implementation of some degree of corrective action does not preclude an agency from finding that contractor nonresponsible. Cf. Stapp Towing Inc. v. United States, 34 Fed. Cl. 300, 309-10 (1995) (upholding Small Business Administration's refusal to issue a certificate of competency to contractor with an unsatisfactory safety record, despite contractor's ongoing corrective action); Reel-O-Matic Sys., Inc., 16 Cl. Ct. at 98-101 (upholding Small Business Administration's refusal to issue a certificate of competency to contractor based in part on contractor's "unsatisfactory performance record in the past on the same type of contract," despite contractor's attempts to increase capacity and hire new technical qualified personnel).

Plaintiff argues that its nonresponsibility determination in the NAT procurement was irrational because the Army considered NCL sufficiently responsible to continue performing the

---

an error. Def.'s Cross-Mot. for J. on the Admin. R. 28-29. The negative feedback from the customer actually pertained to NWTC's contract with Fernridge Strategy Partners ("Fernridge"). NCL 70-73. Because the contracting officer rationally found NCL to be nonresponsible for several other reasons, however, her erroneous reliance on NWTC's performance record with Fernridge is not a sufficient basis to overturn her determination.

HNT contract.  The fact that the Army continued to use NCL Holdings, LLC for the HNT contract -- an emergency wartime contract -- did not hamstring its ability to make a different business judgment when evaluating NCL's responsibility for a second, independent award.  Cf. MCI Constructors, Inc., 1990 WL 293560, at *3 ("A nonresponsibility determination may be based upon the contracting agency's reasonable perception of inadequate prior performance, even where the agency did not terminate the prior contract for default . . . .").

### NCL Has Not Shown That the Army Adopted a Politically Motivated Blacklist Precluding NCL from Receiving a NAT Award

NCL claims that it was arbitrarily excluded from the NAT competition because the Army adopted an improper "blacklist" excluding all HNT incumbent contractors.  Plaintiff contends that the Army's blanket exclusion of all HNT contractors, but not HNT subcontractors, based on their nonresponsibility evaluations was contrary to the FAR and the solicitation.  NCL further contends that the Army's nonresponsibility determinations for the HNT incumbent contractors were pretexts for the Army's politically motivated blacklisting of these contractors.

Although Plaintiff denies that it is alleging bad faith, the substance of NCL's argument is that the Army's responsibility determinations were pretextual and manufactured to exclude the HNT contractors from the NAT procurement.  Such an allegation is a quintessential accusation of bad faith because it claims that the entirety of all HNT contractors' nonresponsibility determinations were unfounded fabrications.  See Madison Servs., Inc. v. United States, 92 Fed. Cl. 120, 130 (2010) (rejecting plaintiff's argument that "bad faith is 'not essential to establish that a cancellation was a pretext'" as an "untenable" argument).  Accordingly, the Court construes Plaintiff's pretext argument as an allegation that NCL's responsibility evaluation was conducted in bad faith.

A bidder alleging bad faith bears a heavy burden of proof to establish its claim with clear and convincing evidence.  See Am-Pro Protective Agency, Inc. v. United States, 281 F.3d 1234, 1241 (Fed. Cir. 2002) (requiring disappointed bidder to make a showing of clear and convincing evidence to support claim that agency did not act in good faith).  As the Federal Circuit has recognized,

> [W]hen a bidder alleges bad faith, "[i]n order to overcome the presumption of good faith [on behalf of the government], the proof must be almost irrefragable." Info. Tech. Applications Corp. v. United States, 316 F.3d 1312, 1323 n. 2 (Fed. Cir. 2003). "Almost irrefragable proof" amounts to "clear and convincing evidence." Am-Pro Protective Agency, Inc. v. United States, 281 F.3d 1234, 1239-40 (Fed. Cir. 2002). "In the cases where the court has considered allegations of bad faith, the necessary 'irrefragable proof' has been equated with evidence of some specific intent to injure the plaintiff." Torncello v. United States, 231 Ct. Cl. 20, 681 F.2d 756, 770 (1982).

Galen Med. Assocs., Inc. v. United States, 369 F.3d 1324, 1330 (Fed. Cir. 2004).

NCL alleges that the Army was apparently under pressure from Congress to exclude HNT incumbent contractors from the NAT procurement.  Plaintiff notes that Congress initiated

an investigation of the Army's transportation arrangements in Afghanistan following media reports alleging that HNT contractors made payments to the Taliban and Afghan warlords to ensure safe passage for their trucking convoys. Subsequently, in June 2010, Congress published a report alleging "that U.S. reconstruction dollars were finding their way into the hands of Afghan warlords and the Taliban." Pl.'s Mot. for J. on the Admin. R. 20-21.[27] NCL claims that this Congressional report prompted the Army to unlawfully exclude all incumbent HNT contractors from the NAT procurement in order to appease Congress. Id. at 21.

Plaintiff's claim that the Congressional report caused the Army to implement a blacklist excluding all HNT contractors from the NAT procurement is conjecture, wholly devoid of record support, and does not come close to making a showing of clear and convincing evidence required to prove bad faith.

The performance concerns identified by the contracting officer in NCL's responsibility determination were not, as Plaintiff contends, "relatively minor matters of contract administration . . . ." Pl.'s Mot. for J. on the Admin. R. 21. Plaintiff's [
                    ] noncompliance with ITV standards, forged mission sheets, pilferage, incident of transponder stacking, referral for proposed debarment, withheld payments due to nonperformance, and failure to timely provide required deliverables taken together reflect serious shortcomings. The contracting officer's reliance on NCL's documented HNT performance failures was a reasonable business judgment, and the fact that Congress was critical of all HNT contractors' practices does not demonstrate the contracting officer's bad faith toward NCL. Nor does the existence of this report prove that the contracting officer failed to exercise her independent judgment in NCL's responsibility assessment.

NCL also contends that the Army's disparate treatment of the HNT prime contractors as compared to the HNT subcontractors is evidence that the Army blacklisted these HNT contractors or applied a per se debarment standard to them. Specifically, Plaintiff contends that the Army systematically rejected all of the HNT prime contractors after subjecting them to a more rigorous responsibility evaluation than the HNT subcontractors. However, the Army's exclusion of other HNT offerors from the NAT procurement based upon their individualized nonresponsibility determinations is not probative evidence that NCL's responsibility evaluation was unreasonable. Plaintiff's effort to impugn a contracting officer's individual responsibility determinations of the other HNT prime contractors not only requires Plaintiff to marshal substantial additional proof but would, if seriously pursued, significantly have expanded the record and scope of NCL's bid protest. Although the responsibility determinations for the NAT awardees are in the AR, the nonresponsibility determinations for six former HNT prime contractors are not, and Plaintiff did not seek to add them. See AR 17938-18266. As such, there is no factual predicate to conduct the disparate treatment analysis Plaintiff urges the Court to

---

[27] The Congressional report Plaintiff cites is not in the AR, and Plaintiff did not seek to supplement the AR with this report. In Plaintiff's Motion for Judgment on the Administrative Record, Plaintiff included a footnote containing a URL of a website that posted the Congressional report. See Pl.'s Mot. for J. on the Admin. R. 21 n.7. Defendant does not object to Plaintiff's referring to the Congressional report in this manner.

undertake. Plaintiff has failed to demonstrate that the contracting officer implemented a "blacklist" or unfairly excluded all HNT contractors from the NAT competition.

## Allegations of Disparate Treament

Plaintiff further alleges that the contracting officer improperly found NCL to be nonresponsible by treating it in an unequal and disparate manner as compared to Anham, LLC ("Anham"), another HNT contractor that was deemed responsible. Specifically, NCL contends that although NCL and Anham were similarly situated offerors with respect to their HNT contract performance and [                        ]; the NAT contracting officers evaluated NCL and Anham differently with respect to responsibility.

As an initial matter, contracting officers are obligated to treat all offerors equally, "evaluating proposals evenhandedly against common requirements and evaluation criteria." Banknote Corp. of Am., Inc. v. United States, 56 Fed. Cl. 377, 383 (2003), aff'd 365 F.3d 1345 (Fed. Cir. 2004); FAR 1.602-2(b) ("Contracting officers shall . . . [e]nsure that contractors receive impartial, fair, and equitable treatment . . . ."). Indeed, "an agency action is arbitrary when the agency offered insufficient reasons for treating similar situations differently." Transactive Corp. v. United States, 91 F.3d 232, 237 (D.C. Cir. 1996). This fundamental principle of equal treatment is applicable in the context of a contracting officer's responsibility determination. Although responsibility determinations must be tailored to the unique situation of a given offeror, a comparison of these two offerors' responsibility determinations is feasible because NCL and Anham performed the same HNT contract, which was predominantly used to measure responsibility for the NAT procurement. The contracting officer's final responsibility determination for Anham acknowledges the comparative nature of the responsibility determination: "By comparing Anham's performance under the HNT contract with the other HNT contractors, all performance records can be seen in the same overall context -- all contractors agreed to provide the same services in the same locations given the same conditions." NCL 179.

Plaintiff alleges that the contracting officer's review of NCL's record in several areas of performance on the HNT contract was arbitrary and capricious in light of Anham's determination of responsibility. Plaintiff has failed to prove, however, that NCL and Anham had sufficiently similar HNT performance records.

At the outset, there is a major difference in NCL's and Anham's status as contractors in Afghanistan. As a result of [                        ] assessment, NCL was determined to be a [
                                                    ] NCL 165-66. As such, NCL was determined to be ineligible for award. NCL 15. Although, as explained above, NCL raised numerous challenges to its ineligibility rating, it failed to demonstrate any basis to undermine [    ] assessment. NCL's instant effort to attack its [    ] rating based upon a comparison with Anham's rating fares no better. In essence, NCL asks the Court to second-guess the contractors' vendor vetting ratings and substitute its judgment for that of [    ] and the Validation Panel and conclude that the nature of Anham's [                    ] was [                ] "worse" than

NCL's.  Pl.'s Classified Annex to Mot. for J. on the Admin. R. 4.  The record does not support NCL's contention.  [                                    ] assessment [


                    ] was an independent reasonable basis for [        ] rating of NCL Holdings as [
                                                    ]  In  contrast,  while  Anham  had
[                                        ] there was no suggestion in Anham's [              ] assessment
[                                                    ].  Moreover, as a
general matter, there is no basis for the Court to find either NCL's ineligible rating or Anham's
eligible rating unreasonable.  These ratings were based on [                                    ]
in the field in Afghanistan that are closer to, and more knowledgeable about, the intricacies of
[                    ] private security providers, and contractors in the Afghanistan warzone.
See Islamic Am. Relief Agency v. Gonzales, 477 F.3d 728, 734 (D.C. Cir. 2007) (stating that
judicial review -- "in an area at the intersection of national security, foreign policy, and
administrative law -- is extremely deferential."); cf. Latif v. Obama, 666 F.3d 746, 750 (D.C. Cir.
2011) (noting that "courts have no special expertise in evaluating the nature and reliability of the
Executive branch's wartime records").

        Given that NCL and Anham were in a dramatically different posture with respect to their
threshold eligibility to perform the NAT contract, they were not similarly situated.  As such,
NCL's disparate treatment argument fails.[28]

_____

        [28] Nor was NCL's HNT performance comparable to Anham's in other areas.  Anham and
NCL were not similarly situated with respect to ITV use.  Although the record does not contain
complete ITV utilization data for both contractors, NCL's rate of ITV use was three times worse
than that of Anham's on December 22, 2009, and in March 2010, NCL received a cure notice,
specifying an ITV utilization rate ranging from 39.51% to 24.94 % in the four weeks prior.
Compare AR 23013-14 (indicating Anham's ITV rate was 60%), with AR 21434-35 (indicating
NCL's ITV rate was 19 percent), 21501.  While NCL improved its average ITV utilization rate
to 93.26% in the 16 months following the cure notice, this improvement does not absolve NCL
of its initial failure to meet this contract requirement.  Anham, by contrast, was deemed "a top
performer regarding this metric."  AR 16260-61; NCL 177.

        Similarly, the NAT contracting officer cited significantly more funds withheld for
performance failures from NCL, than from Anham.  Compare NCL 8 ($5,272,125.20 withheld
from NCL), with NCL 179 ($1,392,499.64 withheld from Anham).  Although a revised final
decision by the HNT contracting officer reduced NCL's liability for withheld payments by
$863,547.31, the total amount of payments withheld from NCL exceeded payments withheld
from Anham.  AR 21557.

        Finally, NCL's admitted incident of transponder stacking was more serious than Anham's
ITV data manipulation.  Anham manipulated ITV data by randomly assigning transponder
numbers to trucks, but this practice did not result in either credit for deliveries that were never
completed or in raising its standing on the Order-of-Merit list, the metric by which HNT
contractors were assigned missions.  NCL 191, AR 16277.

**NCL's Overall Performance on the HNT Contract**

The contracting officer reasonably determined that NCL's performance on the HNT contract as a whole exhibited serious deficiencies and a pattern of noncompliance which combined to raise serious doubts about NCL's ability to perform the NAT contract, citing NCL's [                                    ] failure to comply with ITV standards, forged mission sheets, pilferage, incident of transponder stacking, withheld payments for performance failures, and failure to timely provide required deliverables. These findings were sufficient to justify the contracting officer's conclusion that NCL was nonresponsible. NCL's arguments that it subsequently improved its nonperformance or that it [                                    ] do not alter the evidence that such misconduct occurred.

The FAR does not require that each of the contracting officer's conclusions be independently sufficient on its own to support a finding of nonresponsibility. Rather, the contracting officer's nonresponsibility determination as a whole must be rational. See Ettefaq-Meliat-Hai-Afghan Consulting, Inc, 106 Fed Cl. at 438-39; To the Sec'y of the Army, B-151121, 1963 WL 2036, at *6 (Comp. Gen. Sept. 13, 1963). Even acknowledging those instances where the contracting officer was inaccurate in her assessment of NCL's nonperformance -- the "reoccurring instances" of transponder stacking instead of a single incident, and negative feedback concerning NWTC -- NCL's cumulative failures provided a reasonable basis for the contracting officer's business judgment that NCL lacked the requisite business integrity, ethics,

and perseverance to perform the NAT contract. E.g., To the Sec'y of the Army, 1963 WL 2036, at *6 (finding nonresponsibility determination reasonable because the cumulative effect of deficiencies -- including minor deficiencies -- would "unduly . . . increase the burden of administration from the Government's standpoint.").

### Conclusion

Plaintiff's motions to supplement the AR are **GRANTED in part**.

Defendant's Motion for Judgment on the Administrative Record is **GRANTED**. Plaintiff's Motion for Judgment on the Administrative Record and Permanent Injunction is **DENIED**. The Clerk of Court is directed to enter judgment accordingly.

The parties and the classified information security officer shall propose redactions to this opinion by **February 7, 2013**.

s/Mary Ellen Coster Williams
**MARY ELLEN COSTER WILLIAMS**
**Judge**